UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| James Milardo,<br>    Plaintiff, | :<br>:<br>: |
| v. | :    Case No. 3:06cv609(JBA) |
| | : |
| City of Middletown, Domenique<br>Thornton, and J. Edward Brymer,<br>    Defendants. | :<br>:<br>: |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. # 63]**

Plaintiff James Milardo has sued the former mayor of the City of Middletown, Domenique Thornton, as well as the former chief of police, J. Edward Brymer, and the city itself. According to his Complaint, Milardo, a former municipal employee and political ally of Thornton, alleges retaliation for engaging in protected speech, harassment, constructive discharge, and violation of equal protection. As of Plaintiff's brief in opposition, however, the allegations had been substantially narrowed to two claims: (1) First Amendment retaliation (Pl.'s Opp'n at 2, 5); and (2) "class of one" equal protection (id. at 3). The Defendants collectively move for summary judgment as to these two surviving claims, which, for the reasons that follow, is granted.

## I. Factual Background

The extensive factual record — much of which is irrelevant to the claims Plaintiff now presses — is summarized as follows.

Milardo held various positions for the city, including serving as Director of Central Dispatch, and often working closely with Thornton, from January 7, 1991 until May 9, 2005. (Defs.' Loc. R. 56(a)1 Stmt. ¶¶ 1-5, 8-11.)  Plaintiff was also close with Brymer during this period. (Id. ¶¶ 12-15.)  Beginning in 1999, Milardo was named as a defendant, along with Thornton and the city, in a civil suit alleging sexual harassment and retaliation. (Id. ¶¶ 48-50.)  Against Milardo's wishes, the litigation was settled in May 2002. (Id. ¶¶ 54-57.)  During the time the litigation was pending, Plaintiff began monitoring the city dispatch lines for evidence of sexual misconduct and crude language, which he recorded onto audio tapes. (Id. ¶ 59-60.)  He reported his findings to Thornton and Brymer, and detailed how he was being harassed by other city employees. (Id. ¶¶ 63-65.)  Although the facts surrounding these recordings initially formed the basis of a First Amendment retaliation claim in Plaintiff's complaint in this case (Compl. ¶¶ 9-10), Plaintiff moved to "withdr[aw] any claims under the First Amendment to the United States Constitution arising out of the allegations set forth in Paragraphs 9 and 10 of his complaint" on June 23, 2007 [Doc. # 59], which request was granted on July 11, 2007 [Doc. # 62].

Starting in December 2002 and continuing through 2004, Milardo was the subject of internal complaints by a female city dispatcher who alleged that Plaintiff harassed, retaliated

against, and threatened her. (Id. ¶¶ 80-95.) Following an internal investigation in response to these allegations, Thornton did not discipline Milardo. (Id. ¶¶ 91-103.) The dispatcher subsequently filed several complaints with the Middletown Police, which found no merit in these criminal allegations. (Id. ¶¶ 105-107.) Plaintiff then filed his own complaint in June 2004 with the city regarding the dispatcher, which also alleged that a co-host of a local cable politics show, entitled "The Edge," was harassing and defaming him. (Id. ¶¶ 108, 114, 123.) The city investigated but found no merit in this complaint. (Id. ¶¶ 115-121.) As of 2004, Plaintiff grew increasingly upset at the content of "The Edge," particularly with the view that the hosts were targeting him with public criticism. (Id. ¶¶ 124-126.) Milardo complained to Thornton and Brymer, who responded by telling him that the program and its hosts were not within the city's control and by suggesting that he not watch it. (Id. ¶¶ 127-132.) In August 2004, a warrant for Plaintiff's arrest was issued in connection with his harassment of one of the show's hosts; Plaintiff subsequently entered an Alford plea to these criminal charges. (Id. ¶¶ 133-152.)

In July 2004, facing public criticism for these actions and suffering from stress, Plaintiff obtained medical clearance and city approval for taking leave pursuant to the Family and Medical Leave Act. (Id. ¶¶ 154-161.) Nearly simultaneously, he filed a

3

Freedom of Information Act request with the city on July 16, 2004 seeking, inter alia, extensive documentation regarding complaints against him, police investigation records, communication records and personnel files. (Id. ¶¶ 162–164; Ex. EE.) The city attorney's office compiled the requested documents, but Milardo never claimed them. (Id. ¶ 166.) Thornton, not yet aware of the FOIA letter, approved the leave request on July 19, 2004. (Id. ¶¶ 172–174.) Subsequently, Thornton voluntarily granted him an extended personal leave of absence beyond his FMLA leave until all of his accrued paid time off had been exhausted. (Id. ¶ 184.) Over the next several months, in part because Plaintiff's physician had not cleared him to return to work, Thornton granted Plaintiff further extended leave. (Id. ¶¶ 190–213.) In March 2005, the city personnel director wrote Milardo to ask if any accommodation would allow him to return to work; the city never received any such request. (Id. ¶¶ 214–215; Ex. PP.) Once Plaintiff's paid benefits had finally been exhausted, Thornton asked him to return to work; when he declined on medical grounds, he was terminated effective May 9, 2005. (Id. ¶¶ 216–220; Ex. QQ.)

**II. Standard**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party establishes that there is no genuine issue of material fact to be resolved at trial and

4

that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Materiality is determined by the substantive law that governs the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In this inquiry, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim. Celotex, 477 U.S. at 322-23. "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial," but "need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential Residential

5

Servs., 22 F.3d 1219, 1223-1224 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her favor. Anderson, 477 U.S. at 249 (noting that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"). In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion. Matsushita, 475 U.S. at 587. However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient. Id. at 586 (citations omitted).

**III. Discussion**

    **A.    First Amendment retaliation**

Plaintiff alleges that Defendants retaliated against him for engaging in two types of protected speech: (1) making a FOIA request in 2004 "seeking information about the corrupt use of the communications function by members of the Middletown Police Department" (Compl. ¶ 12); and (2) filing complaints with the city ethics commission regarding two city officials on May 19,

6

2004 (Pl.'s Opp'n at 1-2). The latter is a new theory, raised for the first time in response to Defendants' summary judgment motion.

As a general matter, courts have held that there is no First Amendment right to access government information, even by way of the FOIA. See, e.g., Houchins v. KQED, Inc., 438 U.S. 1, 8-9 (1978) (plurality opinion) ("Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control."); id. at 16 (Stewart, J., concurring) ("The First and Fourteenth Amendments do not guarantee the public a right of access to information generated or controlled by government."); McGehee v. Casey, 718 F.2d 1137, 1147 (D.C. Cir. 1983) ("As a general rule, citizens have no first amendment right of access to traditionally nonpublic government information. A litigant seeking release of government information under FOIA, therefore, relies upon a statutory entitlement — as narrowed by statutory exceptions — and not upon his constitutional right to free expression.")

To the extent there is a limited constitutional right of access to some types of information held by the government, e.g., Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 8 (1986) (recognizing a First Amendment right to access certain aspects of criminal proceedings), Plaintiff has failed to show how what he

7

requested through the FOIA falls within that exception. See Center for Nat'l Sec. Studies v. U.S. Dep't of Justice, 331 F.3d 918, 934-36 (D.C. Cir. 2003) (summarizing the limited ways in which the Constitution guarantees access to criminal trials). Milardo argues in his brief only that, although "the mere filing of a FOIA request is not necessarily ipso facto the exercise of a protected First Amendment right, the nature of the request in this case does merit First Amendment protection." (Pl.'s Opp'n at 6.) In his request, Plaintiff sought information which he believed would reveal evidence of improper conduct by city employees, but he has not shown how this is the type of exceptional request that merits constitutional protection. Moreover, the undisputed evidence shows that the city produced the documents he sought and that his request played no part in the city's ultimate decision to terminate his employment ten months later. Thus, no reasonable fact-finder could conclude that Plaintiff was subjected to an adverse employment decision in retaliation for making any constitutionally-protected request.

Plaintiff's alternative theory of retaliation is based on two letters he wrote to the city ethics commission on May 19, 2004. In the first letter, Plaintiff complained that Councilman Earle Roberts had: "misle[d] the public by not divulging factual information of which he has knowledge [] regarding the Harassment Litigation filed by female dispatchers"; "pretend[ed] . . . to

either have no knowledge of the factual resolve of the [litigation] nor [to] correct his co-host when she ma[d]e comments" on television; improperly claimed a tax benefit on his farming property; and acted under a conflict of interest between the city council and the fire district for which he was a commissioner. (Letter Re: Formal Complaint Against Councilman Earle Roberts, Ex. 1 to Defs.' Reply, at 1–2.) In the second letter, Plaintiff complained that William Wilson, another city official, had defamed him while on "The Edge," in addition to having made racially- and sexually-offensive comments in general while on the air. (Letter Re: Formal Complaint Against Bill Wilson, Ex. 1 to Defs.' Reply, at 1.) Alleging retaliation based on these letters is a theory raised for the first time in opposition to summary judgment; Milardo made no mention of Roberts, Wilson, the letters, or any of these facts in his Complaint, and the only prior reference at all was in Plaintiff's response to an interrogatory which asked him to describe his emotional distress symptoms.[1] In his opposition, Plaintiff also

---

[1] Interrogatory number four asked: "Please describe in detail how your emotional distress initially manifested itself and describe your current symptoms." Plaintiff responded at length about what had bothered him beginning in 1999, including describing how "[a]nother elected official, William Wilson was also allowed to speak all the untruths and slanderous remarks on another public access TV show and I complained regularly and nothing was done, except keep your mouth shut." He concluded: "I will not be able to answer all of this in writing. People responsible are [seventeen people including the two individual defendants], Councilman Earle Roberts, and William Wilson."

9

concedes that he was "clearly motivated in part by his distress at the unfair attacks being made upon him." As the Second Circuit has explained, "speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment, does not pertain to a matter of public concern." <u>Lewis v. Cohen</u>, 165 F.3d 154, 164 (2d Cir. 1999).

However, assuming for the sake of argument that this retaliation theory is properly-raised and in relation to a matter of public concern, <u>cf</u>. <u>id.</u> (finding a matter of "personal interest . . . also one of public concern"), Plaintiff has offered no evidence linking these complaints to an adverse employment action. (<u>See</u> Thornton Supp. Aff., Ex. 2, ¶¶ 6-11 (averring no first-hand knowledge of the ethics complaints, and that Roberts, Wilson, nor the complaints influenced her decision to terminate Plaintiff's employment in May 2005).) In his opposition brief, Plaintiff argues:

> The defendant asked the plaintiff to resign shortly after he engaged in his protected First Amendment activities. He refused. She then made him use up his sick time and terminated him when that was done. The plaintiff contends that there is enough evidence in this scenario to justify a jury's determination that his protected activity was a motivating factor in the end of his employment.

(Pl.'s Opp'n at 10-11.) This account of the events leading directly up to his termination is contradicted by the undisputed

---

(Pl.'s Response to First Set of Interrogatories, Dec. 22, 2006, at 9-10.)

facts in the record, which show that Milardo requested stress-related leave in July 2004, received multiple extensions of this paid leave, was never medically cleared to return to work, and finally terminated after telling Thornton he was unable to return to his job (see generally Defs.' Loc. R. 56(a)1 Stmt. ¶¶ 154-220); Plaintiff has conceded the accuracy of this factual sequence (Pl.'s Loc. R. 56 Stmt. at 9-13).

Furthermore, the filing of the complaints was too remote in time from any adverse action to infer any causal connection. Causation may be satisfied by showing a sufficiently close temporal connection between the protected activity and the adverse action. But "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close,'" which usually means closer in time than a few months. Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001). Plaintiff has offered no evidence connecting the May 2004 ethics complaints to his termination nearly a year later, and therefore no reasonable jury could conclude that his sending of the letters led the city to retaliate against him.

Therefore, summary judgment is granted on Plaintiff's First Amendment retaliation claim.

**B. "Class of one" equal protection**

Plaintiff claims that he was denied equal protection of the law by not being given sufficient accommodations during the period leading up to his termination in May 2005. (Compl. ¶¶ 16-18; Pl.'s Opp'n at 3.) He characterizes this as a "class of one" equal protection claim. (Pl.'s Opp'n at 3, 14, 17 n.1.) The Supreme Court has held that a plaintiff need not be a member of a traditionally protected class in order to allege an equal protection violation, but may maintain a "class of one" equal protection claim, so long as he or she was treated differently from similarly situated persons with no rational basis for such treatment. Vill. Of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). To establish a "class of one" equal protection claim, a plaintiff must show (1) that he has been treated differently from others similarly situated and (2) that the different treatment has no rational justification. African Trade & Info. Ctr., Inc. v. Abromaitis, 294 F.3d 355, 363 (2d Cir. 2002). To prove the first element, "the level of similarity between [a] plaintiff[] and the [comparators] must be extremely high," even to the point of being "prima facie identical in all relevant respects." Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005) (citation and quotation marks omitted). In other words, the plaintiff must show that

> no rational person could regard the circumstances of
> the plaintiff to differ from those of a comparator to a

> degree that would justify the differential treatment on
> the basis of a legitimate government policy [and that]
> the similarity in circumstances and difference in
> treatment are sufficient to exclude the possibility
> that the defendant acted on the basis of a mistake.

Id. at 105.

Milardo argues that he was treated differently under a "class of one" theory in connection with his termination in May 2005: "Unlike others who had been arrested, suffered job-related stress, or otherwise been indisposed, the plaintiff was not given a light-duty position or permitted simply to remain off work pending his recovery." (Pl.'s Opp'n at 3.) The undisputed facts show that Thornton approved Plaintiff's request for leave under the FMLA, and that she granted him further leave until all of his accrued time off had expired. By May 2005, Plaintiff — who was never medically cleared to return to work — had exhausted all of his accrued leave, and was terminated by Thornton. In his brief, Plaintiff names ten other municipal officials who suffice as proper comparators under Neilson.[2] However, he has pointed to no competent evidence showing how these other officials were sufficiently similar to him, nor even described what

---

[2] Specifically, the other city officials include: "John Syc, the former Director of the Middletown Parking Authority; William Baron, the former Director of Water & Sewer; Michael Guarini, the former Deputy Director of Water & Sewer; Robert Ross, the former Fire Chief; defendant Brymer himself; former police Lieutenant Frank Biolissi; former police officer William Clayton; former Personnel Director James Moore; former Deputy Chief of Poli[c]e Lee; and former Public Works Director Salvatore Fazzino." (Pl.'s Opp'n at 14.)

13

accommodations they were given that he was not.  In addition, responding to Defendants' contention that these individuals are insufficiently similar, Plaintiff apparently concedes a lack of similarity: "That may well be so."  Later, Plaintiff elaborates on this point in footnote one of his brief, which reads:

> As noted above, the plaintiff's evidence concerning comparators would be sufficient to survive a challenge under the "similarly situated" test were this a class-based equal protection action; but may well be insufficient to meet the far more rigid "identically situated" test which the Second Circuit alone imposes on "class of one" plaintiffs.

(Pl.'s Opp'n at 17 n.1.)

Plaintiff's only evidence that he was irrationally treated differently from similarly situated persons is his own vague and conclusory allegations.  Because no reasonable jury could find in his favor with respect to this "class of one" equal protection claim, summary judgment is granted.

**IV. Conclusion**

For the foregoing reasons, Defendants' Joint Motion for Summary Judgment [Doc. # 63] is granted. The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/
Janet Bond Arterton
United States District Judge

**Dated at New Haven, Connecticut this 20th day of December, 2007.**